1  JOHN A. SHEPARDSON, ESQ.    SBN: 129081
   59 North Santa Cruz Avenue, Suite Q
2  Los Gatos, California  95030
   Telephone:  (408) 395-3701
3  Facsimile:   (408) 395-0112

4  Attorneys for Plaintiff,
   SHANNON ALYNN RAMSAY
5

6

7

8           UNITED STATES DISTRICT COURT
9          NORTHERN DISTRICT OF CALIFORNIA
                SAN JOSE DIVISION
10
   SHANNON ALYNN RAMSAY,              )    CASE NO.: **C-07-3645 JW**
11                                    )
   Plaintiff,                         )    **DECLARATION OF JOHN A.**
12                                    )    **SHEPARDSON, ESQ. IN SUPPORT**
   v.                                 )    **OF PARTIAL SUMMARY JUDGMENT**
13                                    )
   THE STATE BAR OF CALIFORNIA, and   )    Date:    March 10, 2008
14 DOES 1 - 100 inclusive.            )    Time:    9:00 A.M.
                                      )    Dept.:   Courtroom 8, 4th Floor
15                                    )    Judge:   Honorable James Ware
   Defendants.                        )
16                                    )
                                      )
17                                    )

18     I, John A. Shepardson, Esq., declare:

19     1.    I have personal knowledge of the following facts and circumstances, and would

20 and could competently testify thereto, if called as a witness.

21     2.    I am the attorney of record for Plaintiff Shannon Ramsey.

22
23     3.    Attached hereto and marked as Exhibit 1 is a true and correct copy of the The

24 California State Bar's "General Statistics Report" for the July 2005 Examination.

25     4.    The Report is posted on the The Bar's Website.

26     5.    The Report at page 2 shows the passage rates for 5 different Racial/Ethnic

27 groups—"White", "Black", "Hispanic", "Asian" and "Other Minority.

28

                                    1

6.    The passage rates for "Disabled" applicants is not shown, and counsel for The Bar has admitted the Bar does not compile data for disabled students—thus disabled applicants are not included in the "Other Minority" grouping.

7.    Attached hereto and marked as Exhibit 2 is a true and correct copy of pages 1-2 of "Achieving "Diversity" information from The California State Bar.  Promotion of diversity in the legal profession is reported to be a high priority.

8.    Attached hereto and marked as Exhibit 3 is a true and correct copy of an "AGENDA ITEM" for October 22, 2007 posted on The Bar's Website.

9.    On page 2, The Bar states that applicants are asked to voluntarily provide information regarding the race/ethnicity and gender.

10.    The Bar states "…The Committee of Bar Examiners is gathering this data to assist in the continuing evaluation of the examination."

11.    The performance of the disabled is <u>not</u> being considered in evaluating examination.

12.    On page 7 The Bar indicates the National Conference of Bar Examiners is beginning to collect race/ethnicity and gender information.

13.    Shannon is legally and completely blind.

14.    She has attempted to pass the California Bar Examination on four occasions, and has not succeeded.

I declare under penalty of U.S. law that the foregoing is true and correct.

DATE:  January 1, 2008

JOHN A. SHEPARDSON, Attorney for
Plaintiff SHANNON ALYNN RAMSAY

2

## GENERAL STATISTICS REPORT
## JULY 2005 CALIFORNIA BAR EXAMINATION[1]
## OVERALL STATISTICS

| Applicant Group | First-Timers | | | Repeaters | | | All Takers | | |
|---|---|---|---|---|---|---|---|---|---|
| | Took | Pass | %Pass | Took | Pass | %Pass | Took | Pass | %Pass |
| General Bar Examination | 5909 | 3763 | 63.7 | 2434 | 309 | 12.7 | 8343 | 4072 | 48.8 |
| Attorneys' Examination | 196 | 67 | 34.2 | 129 | 25 | 19.4 | 325 | 92 | 28.3 |
| Total | 6105 | 3830 | 62.7 | 2563 | 334 | 13.0 | 8668 | 4164 | 48.0 |

## GENERAL BAR EXAMINATION STATISTICS

| Law School Type | First-Timers | | | Repeaters | | | All Takers | | |
|---|---|---|---|---|---|---|---|---|---|
| | Took | Pass | %Pass | Took | Pass | %Pass | Took | Pass | %Pass |
| CA ABA Approved | 3725 | 2616 | 70.2 | 936 | 166 | 17.7 | 4661 | 2782 | 59.7 |
| Out-of-State ABA | 1383 | 897 | 64.9 | 391 | 48 | 12.3 | 1774 | 945 | 53.3 |
| CA Accredited | 290 | 75 | 25.9 | 526 | 34 | 6.5 | 816 | 109 | 13.4 |
| CA Unaccredited | 39 | 3 | 7.7 | 164 | 8 | 4.9 | 203 | 11 | 5.4 |
| Correspondence | 78 | 17 | 21.8 | 91 | 6 | 6.6 | 169 | 23 | 13.6 |
| Law Office/Judges' Chambers | 0 | 0 | 0.0 | 2 | 1 | 50.0 | 2 | 1 | 50.0 |
| US Attorneys Taking the General Bar Exam[2] | 253 | 139 | 54.9 | 124 | 34 | 27.4 | 377 | 173 | 45.9 |
| Foreign Attorneys Taking the General Bar Exam[3] | 129 | 15 | 11.6 | 171 | 10 | 5.8 | 300 | 25 | 8.3 |
| 4-Year Qualification[4] | 12 | 1 | 8.3 | 22 | 1 | 4.5 | 34 | 2 | 5.9 |
| Others[5] | 0 | 0 | 0.0 | 7 | 1 | 14.3 | 7 | 1 | 14.3 |
| Total | 5909 | 3763 | 63.7 | 2434 | 309 | 12.7 | 8343 | 4072 | 48.8 |

[1] These statistics were compiled using data available as of the date results from the examination were released.
[2] Attorneys admitted in other jurisdictions less than four years must take and those admitted four or more years may elect to take the General Bar Examination.
[3] Attorneys admitted in foreign jurisdictions must take the General Bar Examination.
[4] Applicants may qualify to take the General Bar Examination through a combination of four years of law study without graduating from a law school.
[5] Applicants in this category qualified to take the examination but do not meet the requirements for allocation to any of the other categories.

12/21/05

EXHIBIT

1

## JULY 2005 CALIFORNIA BAR EXAMINATION
## NUMBER OF TAKERS AND PERCENT PASSING BY RACIAL/ETHNIC GROUP
### GENERAL BAR EXAMINATION FIRST-TIME TAKERS ONLY*

| School Type | White | | Black | | Hispanic | | Asian | | Other Minority | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Took | % Pass | Took | % Pass | Took | % Pass | Took | % Pass | Took | % Pass |
| CA ABA Approved | 2365 | 75.0 | 102 | 46.1 | 301 | 57.5 | 524 | 67.0 | 218 | 63.3 |
| Out-of-State ABA | 839 | 72.0 | 64 | 29.7 | 84 | 54.8 | 216 | 59.7 | 80 | 51.3 |
| CA Accredited | 187 | 27.8 | 19 | 5.3 | 45 | 20.0 | 11 | 36.4 | 15 | 40.0 |
| CA Unaccredited | 20 | 15.0 | 1 | 0.0 | 12 | 0.0 | 2 | 0.0 | 3 | 0.0 |
| Correspondence | 56 | 23.2 | 4 | 0.0 | 7 | 14.3 | 5 | 40.0 | 4 | 25.0 |
| Other | 237 | 48.5 | 8 | 0.0 | 28 | 14.3 | 60 | 31.7 | 40 | 15.0 |
| Total* | 3704 | 69.1 | 198 | 33.8 | 477 | 48.8 | 818 | 61.7 | 360 | 53.3 |

## NUMBER OF TAKERS AND PERCENT PASSING BY RACIAL/ETHNIC GROUP: REPEATERS*

| School Type | White | | Black | | Hispanic | | Asian | | Other Minority | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Took | % Pass | Took | % Pass | Took | % Pass | Took | % Pass | Took | % Pass |
| CA ABA Approved | 483 | 17.6 | 82 | 12.2 | 130 | 17.7 | 153 | 19.6 | 68 | 20.6 |
| Out-of-State ABA | 163 | 12.3 | 55 | 1.8 | 52 | 17.3 | 59 | 18.6 | 46 | 10.9 |
| CA Accredited | 273 | 8.4 | 82 | 2.4 | 65 | 6.2 | 49 | 4.1 | 43 | 4.7 |
| CA Unaccredited | 80 | 2.5 | 33 | 6.1 | 25 | 4.0 | 12 | 8.3 | 12 | 8.3 |
| Correspondence | 58 | 5.2 | 4 | 25.0 | 10 | 10.0 | 13 | 0.0 | 6 | 16.7 |
| Other | 117 | 23.1 | 45 | 6.7 | 30 | 10.0 | 57 | 15.8 | 69 | 7.2 |
| Total* | 1174 | 13.6 | 301 | 6.3 | 312 | 13.1 | 343 | 15.5 | 244 | 11.5 |

*Totals are for those reporting racial/ethnic group.

12/21/05

2

## JULY 2005 CALIFORNIA BAR EXAMINATION
## NUMBER OF FIRST-TIMERS AND REPEATERS PASSING BY GENDER*

| | First-Timers | | | | Repeaters | | | |
| | Males | | Females | | Males | | Females | |
| School Type | Took | % Pass | Took | % Pass | Took | % Pass | Took | % Pass |
|---|---|---|---|---|---|---|---|---|
| CA ABA Approved | 1827 | 70.9 | 1897 | 69.6 | 460 | 14.6 | 476 | 20.8 |
| Out-of-State ABA | 725 | 64.3 | 656 | 65.7 | 221 | 12.2 | 170 | 12.4 |
| CA Accredited | 141 | 22.7 | 148 | 29.1 | 288 | 7.3 | 236 | 5.5 |
| Unaccredited | 21 | 9.5 | 18 | 5.6 | 93 | 6.5 | 69 | 2.9 |
| Correspondence | 48 | 25.0 | 29 | 17.2 | 60 | 6.7 | 31 | 6.5 |
| Other | 192 | 37.5 | 200 | 41.0 | 180 | 13.3 | 144 | 16.0 |
| Total* | 2954 | 63.6 | 2948 | 63.9 | 1302 | 11.4 | 1126 | 14.2 |

* Totals are for those reporting gender.

12/21/05

3

### JULY 2005 CALIFORNIA BAR EXAMINATION
### GENERAL BAR EXAMINATION STATISTICS
### CALIFORNIA ABA APPROVED LAW SCHOOLS

| LAW SCHOOL | FIRST-TIMERS | | | REPEATERS | | |
|---|---|---|---|---|---|---|
| | TOOK | PASS | %PASS | TOOK | PASS | %PASS |
| California Western School of Law | 175 | 101 | 58 | 54 | 10 | 19 |
| Chapman University School of Law | 111 | 66 | 59 | 24 | 2 | 8 |
| Golden Gate University School of Law | 137 | 60 | 44 | 77 | 11 | 14 |
| Hastings College of The Law | 362 | 305 | 84 | 37 | 11 | 30 |
| Loyola Law School-Los Angeles | 335 | 251 | 75 | 90 | 24 | 27 |
| McGeorge School of Law | 263 | 168 | 64 | 62 | 17 | 27 |
| Pepperdine University School of Law | 157 | 114 | 73 | 29 | 5 | 17 |
| Santa Clara University School of Law | 251 | 163 | 65 | 60 | 20 | 33 |
| Southwestern University School of Law | 244 | 162 | 66 | 64 | 13 | 20 |
| Stanford Law School | 83 | 73 | 88 | 5 | 2 | 40 |
| Thomas Jefferson School of Law | 112 | 43 | 38 | 81 | 6 | 7 |
| University of California — Berkeley | 231 | 201 | 87 | 13 | 6 | 46 |
| University of California – Davis | 160 | 118 | 74 | 19 | 4 | 21 |
| University of California — Los Angeles | 265 | 235 | 89 | 20 | 3 | 15 |
| University of San Diego School of Law | 234 | 187 | 80 | 34 | 3 | 9 |
| University of San Francisco School of Law | 176 | 131 | 74 | 33 | 8 | 24 |
| University of Southern California The Law School | 186 | 152 | 82 | 13 | 2 | 15 |
| Western State University College of Law | 69 | 17 | 25 | 109 | 7 | 6 |
| Whittier Law School | 174 | 69 | 40 | 112 | 12 | 11 |
| Total | 3725 | 2616 | 70 | 936 | 166 | 18 |

**JULY 2005 CALIFORNIA BAR EXAMINATION**
**GENERAL BAR EXAMINATION STATISTICS**
**CALIFORNIA ACCREDITED, NOT ABA APPROVED LAW SCHOOLS**

| LAW SCHOOL | FIRST-TIMERS | | | REPEATERS | | |
|---|---|---|---|---|---|---|
| | TOOK | PASS | %PASS | TOOK | PASS | %PASS |
| Cal Northern School of Law | 15 | 3 | 20 | 7 | 0 | 0 |
| Empire College School of Law | 16 | 6 | 38 | 12 | 0 | 0 |
| Glendale University College of Law | 15 | 4 | 27 | 9 | 1 | 11 |
| Humphreys College School of Law | 11 | 3 | 27 | 8 | 1 | 13 |
| John F. Kennedy University School of Law | 11 | 5 | 45 | 54 | 1 | 2 |
| Lincoln Law School of Sacramento | 28 | 7 | 25 | 31 | 5 | 16 |
| Lincoln Law School of San Jose | 18 | 2 | 11 | 33 | 2 | 6 |
| Monterey College of Law | 15 | 2 | 13 | 15 | 1 | 7 |
| New College of California School of Law | 25 | 6 | 24 | 45 | 2 | 4 |
| San Fernando Valley College of Law | 3 | 1 | 33 | 27 | 3 | 11 |
| San Francisco Law School | 12 | 1 | 8 | 26 | 0 | 0 |
| San Joaquin College of Law | 36 | 14 | 39 | 28 | 5 | 18 |
| Santa Barbara College of Law | 9 | 4 | 44 | 15 | 0 | 0 |
| Southern California Institute of Law -- Santa Barbara | 3 | 0 | 0 | 6 | 0 | 0 |
| Southern California Institute of Law -- Ventura | 2 | 0 | 0 | 17 | 1 | 6 |
| Trinity Law School | 12 | 2 | 17 | 52 | 4 | 8 |
| University of La Verne College of Law | 25 | 8 | 32 | 18 | 0 | 0 |
| University of West Los Angeles School of Law | 28 | 6 | 21 | 92 | 6 | 7 |
| Ventura College of Law | 6 | 1 | 17 | 23 | 2 | 9 |
| Schools No Longer in Operation | 0 | 0 | 0 | 8 | 0 | 0 |
| Total | 290 | 75 | 26 | 526 | 34 | 6 |

12/21/05

**JULY 2005 CALIFORNIA BAR EXAMINATION**
**GENERAL BAR EXAMINATION STATISTICS**
**CALIFORNIA UNACCREDITED LAW SCHOOLS**

| LAW SCHOOL | FIRST-TIMERS | | | REPEATERS | | |
|---|---|---|---|---|---|---|
| | TOOK | PASS | %PASS | TOOK | PASS | %PASS |
| American College of Law | 0 | 0 | 0 | 43 | 0 | 0 |
| California Southern Law School | 10 | 1 | 10 | 31 | 2 | 6 |
| Desert College of Law | 1 | 0 | 0 | 0 | 0 | 0 |
| Irvine University College of Law | 0 | 0 | 0 | 3 | 0 | 0 |
| Larry H. Layton School of Law | 1 | 0 | 0 | 3 | 0 | 0 |
| Pacific Coast University School of Law | 9 | 1 | 11 | 15 | 2 | 13 |
| Pacific West College of Law | 5 | 1 | 20 | 9 | 0 | 0 |
| Peoples College of Law | 0 | 0 | 0 | 12 | 0 | 0 |
| Ridgecrest School of Law | 4 | 0 | 0 | 3 | 1 | 33 |
| University of Northern California Lorenzo Patino School of Law | 6 | 0 | 0 | 23 | 1 | 4 |
| Western Sierra Law School | 3 | 0 | 0 | 12 | 1 | 8 |
| Schools No Longer Registered | 0 | 0 | 0 | 10 | 1 | 10 |
| Total | 39 | 3 | 8 | 164 | 8 | 5 |

### JULY 2005 CALIFORNIA BAR EXAMINATION
### GENERAL BAR EXAMINATION STATISTICS
### CALIFORNIA CORRESPONDENCE LAW SCHOOLS

| LAW SCHOOL | FIRST-TIMERS | | | REPEATERS | | |
|---|---|---|---|---|---|---|
| | TOOK | PASS | %PASS | TOOK | PASS | %PASS |
| Abraham Lincoln University | 11 | 2 | 18 | 20 | 1 | 5 |
| Concord Law School | 44 | 10 | 23 | 16 | 2 | 13 |
| Newport University School of Law | 0 | 0 | 0 | 6 | 0 | 0 |
| Northwestern California University School of Law | 5 | 1 | 20 | 7 | 0 | 0 |
| Oak Brook College of Law & Government Policy | 11 | 3 | 27 | 6 | 0 | 0 |
| Southern California University For Professional Studies College of Law | 2 | 0 | 0 | 5 | 0 | 0 |
| University of Honolulu School of Law | 0 | 0 | 0 | 1 | 0 | 0 |
| West Haven University | 1 | 0 | 0 | 0 | 0 | 0 |
| William Howard Taft University | 2 | 0 | 0 | 20 | 0 | 0 |
| Schools No Longer Registered | 2 | 1 | 50 | 10 | 3 | 30 |
| Total | 78 | 17 | 22 | 91 | 6 | 7 |

**JULY 2005 CALIFORNIA BAR EXAMINATION**
**GENERAL BAR EXAMINATION STATISTICS**
**OUT-OF-STATE ABA SCHOOLS WITH 10 OR MORE TAKERS**

| Law School | Took | Pass | %Pass | Took | Pass | %Pass |
|---|---|---|---|---|---|---|
| American University | 42 | 23 | 55 | 4 | 0 | 0 |
| Arizona State University | 2 | 0 | 0 | 10 | 1 | 10 |
| Benjamin N. Cardoza School of Law | 8 | 3 | 38 | 10 | 2 | 20 |
| Boston College | 20 | 15 | 75 | 3 | 1 | 33 |
| Boston University | 30 | 23 | 77 | 6 | 0 | 0 |
| Brigham Young University | 16 | 15 | 94 | 4 | 0 | 0 |
| Brooklyn Law School | 8 | 4 | 50 | 3 | 1 | 33 |
| Case Western Reserve University | 11 | 2 | 18 | 5 | 0 | 0 |
| Catholic University of America | 7 | 4 | 57 | 4 | 0 | 0 |
| Columbia University | 55 | 47 | 85 | 2 | 0 | 0 |
| Cornell University | 22 | 17 | 77 | 2 | 0 | 0 |
| DePaul University | 5 | 0 | 0 | 6 | 1 | 17 |
| Duke University | 28 | 24 | 86 | 1 | 1 | 100 |
| Franklin Pierce Law Center | 7 | 6 | 86 | 3 | 0 | 0 |
| George Washington University | 41 | 34 | 83 | 6 | 0 | 0 |
| Georgetown University | 77 | 59 | 77 | 11 | 4 | 36 |
| Gonzaga University | 20 | 6 | 30 | 8 | 1 | 13 |
| Harvard Univ. Law School | 87 | 73 | 84 | 3 | 0 | 0 |
| Howard University | 6 | 2 | 33 | 6 | 1 | 17 |
| Indiana University — Bloomington | 16 | 10 | 63 | 4 | 0 | 0 |
| Lewis and Clark College | 17 | 7 | 41 | 10 | 5 | 50 |
| New England School of Law | 19 | 6 | 32 | 9 | 1 | 11 |
| New York Law School | 5 | 0 | 0 | 5 | 0 | 0 |
| New York University | 55 | 46 | 84 | 4 | 2 | 50 |
| Northeastern University | 14 | 7 | 50 | 2 | 1 | 50 |

8

12/21/05

**JULY 2005 CALIFORNIA BAR EXAMINATION**
**GENERAL BAR EXAMINATION STATISTICS**
**OUT-OF-STATE ABA SCHOOLS WITH 10 OR MORE TAKERS (Continued)**

| Law School | Took | Pass | %Pass | Took | Pass | %Pass |
|---|---|---|---|---|---|---|
| Northwestern University | 34 | 22 | 65 | 4 | 2 | 50 |
| Rutgers—The State University-Camden | 11 | 2 | 18 | 6 | 0 | 0 |
| Seattle University | 6 | 3 | 50 | 6 | 1 | 17 |
| Suffolk University | 9 | 3 | 33 | 5 | 0 | 0 |
| Syracuse University | 14 | 5 | 36 | 17 | 2 | 12 |
| Temple University | 11 | 5 | 45 | 3 | 1 | 33 |
| Thomas M. Cooley Law School | 9 | 1 | 11 | 16 | 0 | 0 |
| Tulane University | 38 | 29 | 76 | 8 | 2 | 25 |
| University of Arizona | 19 | 17 | 89 | 3 | 0 | 0 |
| University of Chicago | 29 | 24 | 83 | 1 | 1 | 100 |
| University of Denver | 15 | 3 | 20 | 6 | 0 | 0 |
| University of Houston | 8 | 6 | 75 | 2 | 0 | 0 |
| University of Illinois | 19 | 12 | 63 | 1 | 0 | 0 |
| University of Iowa | 16 | 5 | 31 | 4 | 0 | 0 |
| University of Michigan | 31 | 27 | 87 | 2 | 0 | 0 |
| University of Minnesota | 13 | 11 | 85 | 3 | 2 | 67 |
| University of Notre Dame | 24 | 16 | 67 | 1 | 0 | 0 |
| University of Oregon | 15 | 9 | 60 | 5 | 0 | 0 |
| University of Pennsylvania | 30 | 25 | 83 | 0 | 0 | 0 |
| University of Texas | 17 | 11 | 65 | 2 | 1 | 50 |
| University of Utah | 6 | 3 | 50 | 4 | 0 | 0 |
| University of Virginia | 32 | 27 | 84 | 1 | 0 | 0 |
| University of Washington | 9 | 7 | 78 | 2 | 0 | 0 |
| Vermont Law School | 8 | 0 | 0 | 4 | 0 | 0 |
| Villanova University | 9 | 5 | 56 | 2 | 1 | 50 |

12/21/05

**JULY 2005 CALIFORNIA BAR EXAMINATION**
**GENERAL BAR EXAMINATION STATISTICS**
**OUT-OF-STATE ABA SCHOOLS WITH 10 OR MORE TAKERS (Continued)**

| Law School | Took | Pass | %Pass | Took | Pass | %Pass |
|---|---|---|---|---|---|---|
| Washington University | 15 | 11 | 73 | 8 | 1 | 13 |
| Willamette University | 11 | 7 | 64 | 4 | 1 | 25 |
| Yale University | 40 | 38 | 95 | 0 | 0 | 0 |
| All Other Out-Of-State Schools | 267 | 130 | 49 | 140 | 11 | 8 |
| TOTAL | 1383 | 897 | 65 | 391 | 48 | 12 |



SPRING 2006

# Achieving DIVERSITY

### IN THE LEGAL PROFESSION

ACCESS AND FAIRNESS PROGRAM

# DIVERSITY &
# THE STATE BAR
## A View From The Top



BY JAMES O. HEITING
PRESIDENT

Leadership is the foundation of history. Our leaders take us to places and events that are recorded and are the subject of stories and debates for time to come. It is so important when we learn of leaders and the great things they have done that we can relate to them and see ourselves as leaders someday. Growing up, I loved Mickey Mantle, Abraham Lincoln and Mohammed Ali. I was fascinated by the power and prestige of lawyers and judges, senators and legislators.

Whoever our heroes are, we relate to them on many levels and use them to learn and to dream. We step into their shoes in our imaginations, and we fight the fights they fought, and we fight new fights that are our own.

In talking to other governors of the State Bar during the year before my election to the presidency, I learned of the importance and enthusiasm some had for a "pipeline project", to encourage diverse students to a career in the law, and diverse members of the Bar to leadership positions. The more I learned, the more I got excited and after the election, I immediately appointed a Pipeline Task Force to put in place THE model program(s) to do just that. Many groups have had pipeline projects of sorts, but I wanted to put together the best of the best for our Bar. It should be in place by the end of my year and we expect to introduce it, with the great effort of our Task Force volunteers, with Ruthe Ashley as Chair, at the Spring Summit.

When somebody is teaching me, or providing information to me, or moving me onto the "right path", respect and knowledge that they understand what I am about and who they are talking to is of *primary* importance. I must feel that they *understand*. Usually, the more exposure I have to those that are different, the more they become the same...or maybe the more I become the same. In either event, we begin to understand each other. We become blind to our differences and relate to our similarities.

In our society, in our country, we pride ourselves on the diversity of our citizenship. We are made up of all races, creeds, ages, appearances, backgrounds, religions, beliefs. How can we expect our children to live and thrive in this, our world we are forming for them, without diversity in the heroes of their dreams. I want my children to start with the realization that we are all human beings, all struggling for health, love, happiness. I want my children to have heroes of every color and type; and the only way I can have that for my children is if our leadership is as diverse as our citizens. I am happy to report that the State Bar puts diversity at the top of the list of our short and long term goals in its strategic planning.

I look forward to seeing you at the Spring Summit June 2-3, 2006 in San Jose.

## what's inside

**2** PIPELINE INITIATIVES

**3** DIVERSITY AWARDS RECEPTION

**4** MESSAGE FROM THE CHAIRS

**7** STARTING AN ALTERNATIVE DISPUTE RESOLUTION PRACTICE; WHAT WAS I THINKING?

**8** NEWS & EVENTS

The State Bar | Office of Legal Services,
of California | Access & Fairness Programs

STATE LEGAL

EXHIBIT
2

# PIPELINE TASK FORCE:  IN THE BUSINESS OF REPAIRING LEAKS



**BY RUTHE ASHLEY**

The United States Supreme Court stated in Grutter v. Bollinger, 539 U.S. 306, 332-33 (2003) that "access to legal education (and thus the legal profession) must be inclusive of talented and qualified individuals of every race and ethnicity, so that all members of our heterogeneous society may participate in the educational institutions that provide the training and education necessary to succeed in America."

In California, people of color constitute  fifty-three percent (53%) of the population. In contrast, only seventeen (17%) of our over 200,000 attorneys are attorneys of color. The pipeline for people of color into the legal profession is slowing to a mere trickle and leaks are occurring at all levels. From pre-school through law school, and then through retention and advancement into legal practice, under-represented attorneys are being lost. This leakage has created a crisis across the nation in a legal profession that understands the importance of diversity, and the American Bar Association has recognized this problem and is moving to find solutions.

California, as one of the most diverse states in the nation, has also recognized the crisis: Past President, John Van De Kamp, talked about the importance of opening the pipeline and current President Jim Heiting, created the Pipeline Task Force in October 2005. President Heiting asked me to chair the task force, with a goal of finding what the State Bar could do to ameliorate the crisis.

Our Task Force's goal is to review the universe of diversity programs already in place across the nation. Following the review of national programs, Task Force members will recommend programs for inclusion in the Pipeline Model Practices list. Program evaluation is based on several factors including **continuity, impact, sustainability and replicability.**  The goal is to create an on-line list of model practices that can be easily accessed and replicated by bar associations, law firms, corporations, law schools, the public sector or the courts.  Partnerships and collaborations on all parts of the pipeline will be a key component to the success of these model pipeline diversity programs.

The Task Force is divided into four working groups: The education pipeline (Pre-School to grade 20); bar associations and law firms; courts and government sector; and corporate counsel. Task force members include bar association presidents and executive directors, law firm partners, professors, deans, teachers, judges, corporate counsel, chief counsels, and public sector attorneys. The unique aspect of this Task Force is that it addresses the entire pipeline from pre-school to retention and advancement in practice. This is the first time the entire pipeline is working together in a collaborative partnership.

The Task Force is currently reviewing existing programs. Our third meeting will be at the Spring Summit June 2nd and 3rd in San Jose, where the Task Force can get feedback from the attendees of the summit on the proposed Model Practices, as well as input on key issues and initiatives to be addressed by the task force. At this summit, the Courts committee will host a first-ever Judicial Summit for California judges to address the need for increased diversity on the bench.  The Task Force is steadily moving towards the unveiling of the first phase of the project at the Annual Meeting October 5th through 8th in Monterey.

California, under President Heiting's leadership, is leading the way in acting on the issues and problems that face our legal profession. As the Grutter court wrote, "access... must be inclusive" and the leadership of America must look like the  population of America.

## ABA SEEKING CO-SPONSORS FOR DIVERSITY PIPELINE RESOLUTION

The ABA Presidential Advisory Council on Diversity in the Profession has submitted a recommendation "to address significant problems facing minorities with the pipeline to the profession." Several state, local and minority bar associations have signed on to the recommendation and the Council has requested that others sign on as well.

The recommendation urges bar associations to work to ensure that the bar exams of each state do not have a disparate impact on minority passage rates, to work with the LSAC and law schools to ensure that admissions policies do not have a disparate impact on minority acceptance rates, and to work with elementary and secondary schools to support programs that will increase the readiness of minority applicants for college.

To see the resolution go to http://www.abanet.org/op/councildiversity/resolution.pdf

# AGENDA ITEM

**November 126**
Release of Bar
Examination Applicant
Data

**DATE:**      October 22, 2007

**TO:**        Members, Board of Governors
              Members, Board Committee on Regulation, Admissions and Discipline
              Oversight

**FROM:**      The Committee of Bar Examiners
              Gayle Murphy, Senior Executive, Admissions

**SUBJECT:**   Release of Bar Examination Applicant Data

---

### EXECUTIVE SUMMARY

The Committee of Bar Examiners (Committee) recently denied a request from Professor Richard Sander and his research team (collectively "Professor Sander") for certain data regarding bar examination applicants. Professor Sander had requested the Committee furnish to him information regarding applicants' race, gender, bar examination performance, LSAT scores, law school grade point averages and undergraduate grades. Some of the data was collected by the Committee in the past but is no longer part of an applicant's record. Most of the data was collected with the understanding that it would be kept confidential and used by the Committee in its research and publication of general statistics, and otherwise only shared with law schools or other bar admission authorities. Professor Sander wanted to use the information to support his "mismatch theory," which suggests that affirmative action programs in some law schools affect certain minority law students negatively.

In the interest of ensuring that the bar examination remains fair, valid and reliable, the Committee has over the years authorized its testing consultants to conduct studies that use the data provided by applicants as well as other information gathered from sources such as the law schools and the Law School Admissions Council. The Committee has never released applicant data to third parties in the absence of customized individual signed releases from the affected applicants.

Because of the publicity generated by the op ed pieces authored by Professor Sander, in which the Committee' decision to deny the request for the release of confidential information has been criticized, it has been determined that Board review of the Committee's decision would be appropriate.

**EXHIBIT**
**3**
L-STATE LEGAL®

Members, Board of Governors
Members, Board Committee on Regulation, Admissions and Discipline Oversight
October 22, 2007
Page 2


## SUBJECT/ISSUE

Review of the Committee of Bar Examiners' decision denying Professor Richard Sander's request to release confidential bar examination applicant data.

## BACKGROUND

During the online registration application process, admissions applicants are asked to voluntarily provide personal information regarding their race/ethnicity and gender. They are advised, "The following information is to be furnished by each applicant as part of the application process. The Committee of Bar Examiners is gathering this data to assist in the continuing evaluation of the examination. This information will be treated in a confidential manner and will be used only for research purposes.  It will not be retained by the Committee as part of your application."  There is no penalty for not providing the information, and some applicants elect not to do so.

The Committee of Bar Examiners (Committee) began to collect this information approximately 30 years ago in response to concerns that were raised by minority groups (particularly African Americans and Hispanics) that minority candidates were not passing the bar examination at the same rate as non-Hispanic Caucasians or Asians, and if that was true, they wanted to know the source of the difference.  Specifically, their concern was whether the bar examination was biased against these groups, or was something else occurring?

At that time, however, no bar applicant data was available to determine whether there was a difference in passing rates among different minority groups, let alone the magnitude or source if there was. This led the Board of Governors (not the Committee) to commission Stephen P. Klein (the Committee's psychometric consultant) to conduct a study that involved gathering racial/ethnic and gender data along with LSAT scores and law school grade point averages (GPAs). This study found that (1) there were large differences in passing rates among these groups and (2) these differences corresponded very closely to differences between groups in their law school GPAs.  No bias in the bar examination itself was detected.  After this study was published, minority groups requested that the Committee collect gender and race/ethnic data on a routine basis, which the Committee agreed to do.  General statistics from the bar examination, which contain detailed information relative to minority and gender pass rates and individual California law school pass rates have been maintained since 1977.

Over the years, the Committee has commissioned several related studies, which were conducted by Dr. Klein, all of which focused on the examination itself, such as whether the generally low pass rates for minority applicants is due to a possible bias in the examination's questions, time limits, or other features. This is in keeping with the Committee's mission to ensure the "quality" of the bar examination as indicated by its

2

Members, Board of Governors
Members, Board Committee on Regulation, Admissions and Discipline Oversight
October 22, 2007
Page 3

validity, reliability, fairness, and cost effectiveness. Attached as Appendix A is an index of studies that have been authorized by the Committee, which have been prepared by Dr. Klein. The Committee has never authorized a study that would have used bar examination applicant data solely to investigate the effects of specific law school programs, such as schools' affirmative action policies. The Committee does provide various examination sub-scores of the applicants (as a group) to the California law schools that they are allocated to for each administration of the examination, which allows law schools to monitor the effects of instruction (such as whether their students are having more difficulty with certain subjects) and to compare the performance of their graduates to other law schools in the same categories. Attached as Appendix B is a sample of the report that is currently provided to the law schools, individually, which shows how their students perform on the bar examination compared to the overall numbers and other law schools in their categories.

The fact that any individual is an applicant for admission to practice law in California is considered a privacy issue; all information provided by the applicant is treated confidentially until the individual passes the bar examination. Even then, the Committee releases only the names of those who pass the examination. The only exceptions occur when the Committee confirms an applicant's legal education qualifications and through the moral character investigation process when questionnaires are sent to employers, references and other licensing boards. The applicant is required to sign releases as part of both the bar examination and the moral character determination application process.

The bar examination application release specifically authorizes the Committee to ". . . release information regarding my application to take the bar examination and my bar examination scores and pass/fail status to the law school to which I have been or will be allocated for purposes of qualifying to take the California Bar Examination." The only other authorized release of related information is to other bar admission authorities.

## Request Submitted by Professor Sander

In response to his request for a meeting, in May 2006, Richard Sander, Ph.D., a professor at the University of California Los Angeles School of Law, met with staff from the Office of Admissions. During that meeting, he inquired as to whether he might be able to access the bar examination applicant data maintained by the State Bar's Office of Admissions to continue with his study of affirmative action programs in law schools and their possible negative effect on minority law students. He was advised that he was welcome to submit a request to the Committee for its consideration, although generally the Committee did not release confidential information to third parties.

Following that meeting, a request dated September 5, 2006 from Professor Richard Sander, UCLA, Dr. Stephen Klein, GANSK & Associates, Professor William Henderson of Indiana University and Professor E. Douglass Williams of Sewanee University,

3

Members, Board of Governors
Members, Board Committee on Regulation, Admissions and Discipline Oversight
October 22, 2007
Page 4

entitled "Proposal for analyses of state bar data" (Appendix C), was received. Professor Sander and Dr. Klein appeared at the September 2006 Committee meeting and made a presentation on the proposal. The Committee deferred making a decision on the request to enable it to study the proposal further, and to discuss it with the Law School Council, which is composed of ten law school deans elected by their colleagues by category of school, three Committee members and the Chair of the Board Committee on Regulation, Admissions and Discipline Oversight. Also, Committee members expressed their desire to seek advice of counsel.

During its October 2006 meeting, the proposal was discussed by the Law School Council. Several deans voiced their concerns about the proposal. In particular, they believed that: 1) if the data were released to Professor Sander's group, it should be available to anyone else who might ask for it for the purpose of doing their own study(ies); 2) there were questions regarding the independence of the research team, as it might have its own motives related to proving certain theories; and, 3) the confidentiality of bar applicant data should be preserved. Professor Sander was advised of the concerns that were raised during the meeting, and he responded with a supplemental memorandum dated November 19, 2006 (Appendix D). In addition, a telephone conference call was set up, at Professor Sander's request, between the Committee's Subcommittee on Examinations Chair, Alan Yochelson, Gayle Murphy, Dean Barbieri, Examinations Director, and Professor Sander to discuss the proposal further.

Consideration of the proposal, which included the supplemental information that had been gathered, was scheduled for the Committee's December 2006 meeting, but at Professor Sander's request, further review was deferred to the February 2007 Committee meeting. Several letters, some in support and others not, were received regarding the proposal, which included letters from five members of the U.S. Commission on Civil Rights, from John Steele (on his own behalf), from Judy Sakaki, Vice President, Student Affairs, University of California, transmitting a memorandum by special assistant Bill Kidder, and from Eileen Kaufman and Tayyab Mahmud, Co-Presidents of the Society of American Law Teachers (Appendix E). A response was sent to the members of the Commission on Civil Rights advising them of the status of the request (Appendix F).

The Committee had the proposal on its agenda for discussion and possible action during its February 2007 meeting. Included in the agenda item was a new memorandum from Professor Sander's group dated January 26, 2007 (Appendix G). During that meeting, the Committee also considered advice from counsel during the closed portion of the agenda. The Committee decided again to defer making a decision on the request so that it could further study the matter. Before making a decision on the request, there was a consensus that the Committee would benefit from more information regarding research studies that it had authorized in the past, and possible

Members, Board of Governors
Members, Board Committee on Regulation, Admissions and Discipline Oversight
October 22, 2007
Page 5

research studies that it might conduct in the future related to ensuring the fairness and validity of the examination process.

During its May 2007 planning meeting, a briefing was received from the Committee's psychometric consultant, Stephen Klein, Ph.D., on the research that had been conducted in the past on the California Bar Examination, and presentations from him and another independent measurement consultant, Edward Haertel, Ph.D., on what future studies the Committee might consider were also received. Professor Sander was invited to attend the meeting in the belief he might find it interesting; however, consideration of his specific request and proposed study during the May meeting was not contemplated nor cited as an item on the agenda.

Having studied the matter in great detail, it was anticipated that a final decision regarding the proposal submitted by Professor Sander's group would be made at the next Committee meeting, which was scheduled for June 29 and 30, 2007. Professor Sander contacted staff and asked that another meeting be scheduled with him (and others) to discuss how the ". . .study might be handled as an internal bar contractual study." In a June 15, 2007 email, Professor Sander wrote to Gayle Murphy, "I realize you had wanted to make a report to the committee at the end of the month, and this timeline squeezes that....but certainly from our perspective, we'd rather have a chance to talk through the specific issues and explore different formulations for the study, than get an early answer, so a slower timeline would be fine with us." Because of scheduling conflicts, an additional meeting with Professor Sander and others he had wanted to have there could not be held before the June Committee meeting.

There was a general consensus between Committee members and staff that a final decision needed to be made on the original proposal. Professor Sander was advised that the Committee would be taking action on the proposal during its June 29 and 30, 2007 meeting. A decision regarding this particular proposal did not preclude further discussions of possible alternative studies and the methods by which they could be conducted. No additional presentations from the proposal's authors were contemplated nor planned. Professor Sander voiced concern that the Committee would be making its final decision in his absence, and arrangements were made so that he could address the full Committee on the matter during its meeting on the morning of June 30, 2007. He attended the meeting, made his presentation, and after substantial and substantive discussion, the Committee voted to deny his request for use of the bar examination applicant data.

A formal letter was sent to Professor Sander and Professor Henderson advising them of the Committee's decision and outlining some of the reasons the request was denied (Appendix H). The Committee's primary reason for denying the request was that applicant information is collected with the understanding that it is confidential and will only be used by the Committee for purposes related to the bar examination and the

Members, Board of Governors
Members, Board Committee on Regulation, Admissions and Discipline Oversight
October 22, 2007
Page 6

publication of general examination statistics. The Committee generally does not release applicant data to third parties in the absence of customized individual signed releases. Professor Sander wrote a letter to the Committee in response (Appendix I) to its decision. In that letter, which was very critical of the Committee's process for consideration of the request and the decision that was made, was a statement to the effect that the Commission on Civil Rights would be asking the Committee to reconsider its decision. On August 24, 2007, the *Wall Street Journal* published a commentary from Gail Heriot objecting to the decision of the Committee. Since then several op ed pieces authored by Professor Sander and his colleagues have appeared in various newspapers, in particular the *Daily Journal* and *The Los Angeles Times*, in which the State Bar has been criticized for not granting Professor Sander's request. Additional articles and letters to the editor concerning the matter appeared in *The Recorder*. And, just recently, an article critical of Dr. Sander and in support of the Committee's decision appeared in *The National Law Journal*. Nothing has been received to date from Professor Sander or his colleagues specifically seeking reconsideration of the Committee's decision.

**General Comments**

Providing bar examination applicant data for use in the proposed "mismatch" study would be a significant departure from past research practices. The closest the Committee came to doing something similar was in the late 80's when a type of mismatch study was authorized: "Are Bar Exam Scores Affected by Law School Admissions Practices." The findings of that study were: ". . . Black and Latino passing rates on the bar exam probably would not be improved by encouraging minority group applicants to attend law schools with students whose LSAT scores are more similar to their own scores. And, in all racial groups, high ability applicants (as measured by LSAT) have about the same high probability of passing the bar exam. . . ." It should be noted that it appears that one of the major limitations of Professor Sander's proposed research is that unlike the study that Dr. Klein did almost 20 years ago, law school GPA data is no longer available as part of the data collected by the Committee. This is important because law school GPA typically is usually a far greater predictor of success on the bar examination than is the LSAT. Twenty years ago the Committee routinely gathered law school GPAs, which was complicated by having to convert all the different systems for reporting grades (4-pt, 100-pt, letter grades, etc.) to a common scale of measurement. The practice of recording law school GPAs was discontinued many years ago for several reasons, such as changes in computer systems and personnel, availability of resources, cost, etc.

Another problem with the request is that the Committee does not have undergraduate grade point averages (UGPA) data available as part of the data it currently collects, which is necessary for some of the analyses Professor Sander hopes to complete. If the decision is modified and available data is released to Professor Sander, only LSAT

Members, Board of Governors
Members, Board Committee on Regulation, Admissions and Discipline Oversight
October 22, 2007
Page 7

scores would be available as part of determining the qualifications at the point of entry into law school, even though more selective law schools also give significant weight to UGPA.

Professor Sander is asking also for some data that the Committee is not authorized to share with third parties, such as data related to applicants' LSAT scores. Most likely, written consent from the Law School Admissions Council would need to be obtained before LSAT data could be released to Professor Sander.

Comments have been made to the effect that the Committee has cooperated with an outside entity in the past by providing bar applicant data to the Law School Admission Council (LSAC) for its bar passage study. This is true, however, it should be noted that this was not without special permission to do so. A letter was sent to Chief Justice Malcolm Lucas from the then State Bar General Counsel, Diane Yu, requesting the Court's assistance and instruction on how to comply with the request of the LSAC for confidential bar application information (this was for the examinations administered during the period July 1988 through February 1991). After an agreement between the LSAC and the State Bar was signed, the LSAC provided the Committee with the list of names of applicants, all of whom had signed a release permitting the release of this information to the LSAC, and data, which included specific details relative to their bar examination performance, was then compiled and provided to the LSAC.

After surveying bar administrators in several other United States jurisdictions, it does not appear that Professor Sander, nor any of his colleagues, have approached any other bar admission agencies for release of similar data. While most states do not collect racial/ethnic and gender data in the first place, only one administrator indicated that release of any bar examination applicant data to an independent research group, such as Professor Sander's, might be approved by the Bar Examiners. The National Conference of Bar Examiners has begun to collect ethnic/race and gender data from applicants applying to take the Multistate Professional Responsibility Examination and with that data intends to conduct its own studies.

**Future Considerations**

Denying Professor Sander's request does not preclude the Committee from considering future studies of its own or in partnership with others. The Committee has as an ongoing goal, in fact, one that is included in its strategic plan, to consider and authorize future studies to ensure that the examinations it administers (the First-Year Law Students' Examination and the California Bar Examination) remain fair, valid and reliable tests. Following a decision as to what additional studies should be completed, the appropriate data to be collected needs to be identified, funds to pay for the studies need to be allocated, whether working with other entities is appropriate should be contemplated, and modifications to the current release forms signed by the applicants

Members, Board of Governors
Members, Board Committee on Regulation, Admissions and Discipline Oversight
October 22, 2007
Page 8

may need to be considered. The Committee believes that these future discussions should be done in partnership with the law schools – keeping in mind the different roles they have. If a law school's graduates are not performing well on the bar examination there is a legitimate need for the law school to determine why, and the sharing of certain data collected by the Committee may be helpful in making those assessments.

**FISCAL AND PERSONNEL IMPACT**

None

**BOARD BOOK/ADMINISTRATIVE MANUAL IMPACT**

None

**RULE AMENDMENTS**

None

**PROPOSED BOARD COMMITTEE/BOARD RESOLUTIONS**

Following a presentation by the Chair of the Committee of Bar Examiners, and comments received during the meeting, if the Board Committee on Regulation, Admissions and Discipline Oversight believes that the Committee of Bar Examiners' decision denying the request from Professor Richard Sander for the release and use of California Bar Examination applicant data should be confirmed or modified, a resolution will be drafted for consideration by the Board Committee and the Board of Governors during their meetings on November 8 and 9, 2007.

BOG126.1107